## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **ALAN NORDIKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-2686-JAR** |
| | ) | |
| **VERIZON BUSINESS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff Alan Nordike brings this action against his employer, Defendant Verizon

Business, Inc. ("Verizon"), for alleged retaliation in violation of Title VII of the Civil Rights Act

of 1974, 42 U.S.C. § 2000e *et seq* ("Title VII"), and the Americans with Disabilities Act of 1990,

42 U.S.C. § 12101 *et seq*. ("ADA").  This matter is before the Court on Verizon's Motion for

Summary Judgment (Doc. 37).  After reviewing the parties' briefs, the Court invoked Fed. R.

Civ. P. 56(f)(2) and directed Plaintiff to file a submission stating why summary judgment should

not be granted to Verizon with respect to his putative claim of retaliatory hostile work

environment, as well as to clarify whether he is also asserting claims for discrete acts of

retaliation (Doc. 51).  The parties have submitted their supplemental briefs (Docs. 52, 59), and

the Court is ready to rule.  For the reasons explained in detail below, the Court grants summary

judgment in favor of Verizon on all of Plaintiff's claims.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no

genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

"set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[10] To accomplish this, the facts "must be

identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated

therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge

and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party

cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by

specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it

is an important procedure "designed to secure the just, speedy and inexpensive determination of

every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on

ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the

mere hope that something will turn up at trial."[15]

---

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

**II      Uncontroverted Facts**

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff, the non-moving party.

Plaintiff has been employed by Verizon since 2006 as a Senior Sales Engineer, also referred to as a Senior Solutions Architect.  Sales Engineers ("SEs") support the account managers by providing product and technology expertise.  Account managers are Verizon's sales personnel whose responsibility it is to develop sales opportunities.  SEs are considered generalist or product specialists.  Plaintiff is a specialized SE focusing on unified communications and collaboration ("UCC") products, including voice over internet protocol ("VOIP"), which is a technology that allows people to speak over an internet connection.  Plaintiff's primary function is to provide VOIP support and expertise to the account managers and generalist SEs once a sales opportunity was established by the account manager and generalist.  Plaintiff also makes outside sales calls to customers, including at times initial sales meetings with account managers.

In 2010 and 2011, Plaintiff supported account managers and their accounts located in Kansas, Missouri, and Arkansas, known as the tri-states region.  Plaintiff was designated as a regional lead, which meant he was permitted to submit designs for field trials to a higher-level engineering group known as "Tier II," for approval.  Plaintiff's primary job duties of providing VOIP expertise while designated a regional lead were not altered, and there was no pay increase associated with the designation.  In 2010, Plaintiff's manager was Brenda Kubicki, who was also located in the Overland Park, Kansas office.

*Melin Investigation/Internal Complaint*

In August 2010, Plaintiff was interviewed by Mandy Moses from Verizon's Human

Resources Department in connection with an internal investigation of a complaint made by a co-worker, Curt Melin, alleging Melin was the victim of discrimination based on race, disability and retaliation (the "Melin investigation" or "Melin complaint").  Plaintiff submitted his own internal complaint of retaliation in September 2010, against his then-manager Kubicki ("Internal Complaint").  On September 20, 2010, Plaintiff sent an email to Moses stating that since his participation in the Melin investigation, he felt that he was being retaliated against.  Moses responded to Plaintiff's email that same day, requesting a time to speak to Plaintiff that day about his concerns.  After numerous attempts to reach him, Plaintiff responded to Moses's email on September 24, 2010, and provided the specifics of his allegations of retaliation: (1) Kubicki has been hostile to him "since the investigation"; (2) "prior to [Moses] calling [him] about the investigation," Kubicki was having meetings offsite with other SEs, but he was not included; (3) Kubicki "questioned everything [he] had been working on," specifically the Sunshine Energy, Nations Holdings, and ANG accounts, "which were all tagged to Melin"; (4) Kubicki "doubled" his workload; and (5) Kubicki said to him, "do YOU like your paycheck? . . . would you like the paycheck of a technician?"  Moses also spoke with Plaintiff by telephone several days later.

In October 2010, Moses went to the Overland Park, Kansas office to conduct an investigation of Plaintiff's complaints.  While there, she interviewed at least seven individuals regarding his allegations, including Kubicki.  Moses subsequently telephoned Plaintiff and advised him that she was unable to "corroborate the situation [he] reported" after conducting a "thorough investigation" of his allegations of retaliation by Kubicki.  Although no disciplinary action was taken, Verizon "took the opportunity to reinforce expectations" with Kubicki.

***Changes in Verizon Structure/Organization***

*2011*

In January 2011, Verizon changed its focus on providing strategic services in the areas of UCC, IT, and security services.  To better facilitate the sale of those opportunities, Verizon reorganized its SEs into separate "towers" for each focus area with specialized sales teams in each tower, with each tower assigned to a manager.  This was a company-wide reorganization that resulted in all SE specialists, including UCC SEs, having their own managers.  As a result of the reorganization, Ruben Robles was promoted to Solutions Engineering Manager, and became Plaintiff's manager.  Robles, whose office is in Texas, oversees a group of UCC SEs (or Solution Architects).  The decision to promote Robles was made by Brenda Tyre, the SE Director.  At the time she made the decision, Tyre was not aware that Plaintiff had participated in an internal investigation or made an Internal Complaint.  In January 2012, all SEs who reported to Robles were assigned the title of "service engineers," and were instructed to bill their time to specific customers.  This new title did not affect Plaintiff's compensation or pay.

*2012*

In March 2012, Verizon again reorganized the sales engineering organization, and Jim Sloan became Plaintiff's manager.  As part of the reorganization, Verizon realigned its geographic regions; Kansas and Missouri were made part of the Midwest region, while Arkansas was assigned to the Southern region.  The reorganization affected all sales and SEs across the country. Plaintiff was aligned to the Midwest region, and was tied to those accounts for compensation purposes.  After the reorganization, Plaintiff no longer supported accounts based in Arkansas, including the Walmart account.  Another SE, Jeff Morrison, who lived in St. Louis and worked in Bentonville, Arkansas, remained on the Walmart account.

6

*Verizon's Compensation Structure*

From 2009 through 2012, Plaintiff received a base compensation and was eligible for commissions.  During 2009, SEs were not individually assigned their own accounts for commission purposes, but were assigned to a branch, such that all SEs assigned to a branch were paid commissions based on all sales generated by that branch, including international "B-end" accounts.  In Plaintiff's case, as well as four other SEs supervised by Kubicki, that was the tri-states region.  In 2010, SEs were not individually assigned their own accounts for commissions purposes, but were aligned with sales managers in their region and all sales attributed to those sales managers, as well as the account executives who reported to those managers, were attributed to the assigned SEs.  That year, Plaintiff and four other SEs were aligned with sales managers Chuck Long and Roger Peterson.  As a result, the specific accounts Plaintiff was assigned to or removed from during 2009 through the present was irrelevant for commission purposes, and there was no additional compensation given to SEs for generating new accounts.

Beginning with the corporate reorganization in January 2011, SEs were paid commissions based on all sales of the particular product the SE supports within the SE's branch. Accordingly, beginning in 2011, Plaintiff was paid for all Networking and Communications sales, which includes products such as VOIP, within the tri-states region, regardless of what accounts he worked on.  When Verizon again reorganized its sales and sales engineering organization in March 2012, Communications, Networking & Mobility ("CNM") SEs on a team were assigned to the same accounts and were paid on CNM sales made to those accounts.  All Verizon CNM SEs, including Plaintiff, were paid commissions in this manner for the period of March through December 2012.  Because Plaintiff was in the Midwest region for the latter part

of 2012, his commissions were paid based on that region.

The 2009 through 2012 compensation plans for Verizon SEs require that any disputes related to commissions be submitted within sixty (60) days of the actual or expected day of payment of the commission, and provide that failure to submit a claim within the 60-day period will constitute a waiver of any claim.

Beginning in 2013, the compensation structure for SEs was changed to SEs receiving a base salary, with eligibility for a short-term incentive plan rather than commission.  Under this plan, SEs were assigned to opportunities rather than accounts using a tool called Salesforce.com.

### *Relationship with Austin Kyser/Reassignment of Kansas City Accounts*

In 2011, Plaintiff was assigned to work with Austin Kyser, a global solutions consultant for Verizon, who was known to be difficult to work with.  Plaintiff and Kyser's respective managers, Robles and Shaun Trippel, were aware that Plaintiff and Kyser had difficulty working with each other.  During a conference call, Kyser stated that he would never work with Plaintiff again, which was met with laughter by the call recipients.  Robles then asked Plaintiff, "what do you want me to do about it?"

Robles regularly held one-on-one meetings with his team, including Plaintiff.  Robles testified that he did not have any concerns about Plaintiff's expertise as an SE, and that he was a "top engineer" with the ability to create complex designs and present them to customers in a professional manner.   Trippel, the sales manager for the tri-state region in 2011, raised concerns in mid-2011 about Plaintiff's availability, as did Kyser.  Robles testified that Plaintiff was not in the office every day and his voicemail box was often full.  Robles attributed these issues to

Plaintiff's demanding workload, characterizing him as "one of the, if not the busiest folks on my team."  Plaintiff testified that in 2010 and 2011, he was "swamped with too many—with a bunch of projects."[16]  Robles asked Plaintiff if he was too busy, and what he could do to help alleviate that so he could get some rest and take care of things that needed to be taken care of.  Plaintiff responded that he had it "under control" and had a list of work that he was prioritizing.  Robles's concerns about Plaintiff continued throughout the year, as Plaintiff continued to miss staff meetings and let his voicemail box get full.  Robles continued to talk to Plaintiff about the issue, and took steps to assist him with his heavy workload.  Verizon hired Kyle Baggett in September or October 2011, to primarily handle the St. Louis accounts.  Rich Schuchmann, a generalist SE, was assigned some of the less complex VOIP projects for the Kansas City and St. Louis accounts, and assisted both Plaintiff and Baggett.  Plaintiff testified that three or four months later, the accounts were "dumped back in my lap."

In February 2012, Kyser's new manager, Andrew Berg, emailed Trippel to ask about the ongoing conflict between Kyser and Plaintiff.  Trippel stated in an email to Berg that he believed Plaintiff "is the issue."  Berg then corresponded with HR representative Harnet Tsehaye about the situation, and whether there was any information he needed to know about Plaintiff that would help him manage Kyser.  The email chain continues between HR representatives discussing a pending EEOC charge filed by Plaintiff.  After speaking with Brenda Tyre, HR reported that Tyre had not received any complaints about Plaintiff's performance, and they had reached the conclusion that Kyser was likely motivated to make new complaints because he is reporting to a new manager, with "a new set of ears."  HR speculated that Kyser was attempting

---

[16]Doc. 38, Ex. 1 at 196:12-21.

to blame his performance issues on lack of support from his SE, and that the approach by Robles and Trippel was that Plaintiff and Kyser were two adults that needed to find a way to work together, and that she did not think there was any further action to be taken.[17]  The emails between the HR representatives were labeled "CONFIDENTIAL," and Berg was not copied on the emails.

### *EEOC Complaint*

On October 24, 2011, Plaintiff filed a charge of discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC"), based on age, disability and retaliation. Although the parties stipulate to the filing of the Charge in the Pretrial Order, no copy is included in the record.[18]

### *Complaints to Supervisors*

Nordike sent an email to Robles and Tyre dated November 16, 2011, in which he complained that he was being scrutinized and unfairly blamed for the conflict between himself and Austin Kyser.[19]  Plaintiff also stated that he was concerned he was "continuously being brought into question and scrutinized on every opportunity I work on," as well as "you continue to raise this perception of me not being available."  Plaintiff also complains that Trippel has pulled him off his weekly priority meetings.  Plaintiff requested support to "run interference on these distractions," and stated that "I feel that I am being put in a compromised position for reasons unbeknounced [sic] to me."

---

[17]Doc. 39, Ex. 29.

[18]Doc. 34, ¶ 2.a.iv.

[19]Doc. 42, Ex. 19.

Plaintiff sent a separate email to Robles and Tyre dated January 25, 2012, after Robles requested him to sign his 2012 Performance Agreement.  Plaintiff stated that he believed his new role as a service engineer was a demotion, questioned whether he would still be supporting the Walmart account, and expressed concern that he was put into this new role as a direct result of his "outstanding complaints."[20]

### Ethics Complaint

In February 2012, an ethics complaint was filed against Plaintiff for his work on an account with BNIM.  The complaint was based on a report filed on February 27, 2012, by Mark Red, a contracts manager in Verizon's legal department, requesting information about a potential conflict of interest because Plaintiff declined to provide information about his relationship to his brother Mark Nordike, who worked for a company that was a potential Verizon customer. Verizon policies prohibit any employee from supervising Verizon's business relationship with any company that employs someone with whom the Verizon employee has a close personal or family relationship, and requires employees to disclose any potential conflicts of interest. Plaintiff did not disclose his family relationship with Mark Nordike to Verizon, and has no knowledge of any communications between Red and Robles or Kubecki regarding the ethics complaint.  Plaintiff received a written warning for his failure to disclose his family relationship, but no other disciplinary action was taken against him.

### Removal as Regional Lead

On October 4, 2012, Plaintiff received an email from Joe Alice, a Senior Consultant Solutions Architect/Developer, stating that the number of regional leads was being scaled back

---

[20]*Id*. Ex. 10.

by Verizon nationwide, and that Plaintiff was being removed from his regional lead position.[21]

Sloan followed up with an email to Plaintiff explaining that there were twenty-four SE's in the

company that were designated as leads, who were not submitting complete or accurate field

trials, causing remediation by Tier II for "things that should have been caught," and that whether

the Tier II submissions go through him as a lead does not change his status as a Senior UCC

SE.[22]  On October 5, 2012, Plaintiff emailed Sloan to express his belief that his removal as

regional lead was a demotion and "a direct result of his outstanding complaints and indicates yet

again, more retaliation against me."[23]  Sloan responded on October 8, stressing that Plaintiff had

not been demoted and explaining that there was confusion about the lead title, as it is not a

formal designation.[24]  Sloan further stated that multiple regional leads across the country were

re-designated to help scale Verizon resources more efficiently, and stressed that if Plaintiff was

alleging that this was a retaliatory action, it would not be tolerated and needed to be taken to

HR.[25]

### Nordike's Performance Evaluations

For the calendar years 2009, 2010, 2011 and 2012, Plaintiff received a "performing"

rating from his managers, which is defined as "[e]mployee sustained performance, meeting

objectives, requirements and expectations, and periodically exceeded them." In his 2011 mid-

year review, Robles stated that Plaintiff "has been working on some of the largest and most

---

[21]Doc. 38, Ex. 33.

[22]Doc. 44, Ex. 12.

[23]*Id.*

[24]*Id.*

[25]*Id.*

complex VOIP designs in the region," and that Plaintiff "continues to partner well to drive VOIP solutions to our customer base."  In his 2012 year-end review, Sloan stated that Plaintiff needed to improve effective communication from team members and to ensure promptness and preparedness for meetings.

### Issues in 2013

In 2013, Plaintiff made an inquiry about the calculation of his commissions for 2012, and Verizon determined that certain accounts had not been properly assigned for commission purposes.  Plaintiff was compensated on those missing accounts on August 30, 2013.  These accounts should have been assigned to Sloan's entire SE team, and each of the members of the team received an adjustment to their 2012 commissions.

Verizon recognizes its sales people and SEs by designating some of them annually for inclusion in the President's Club, which is determined based on numerical rankings based on sales attributed to each SE.  Plaintiff was not made a member of the President's Club in 2013. Robles and Sloan were made members; by then, Robles was on a different sales team than Plaintiff.  The additional commissions paid to Plaintiff in 2013 for 2012 sales had no impact on President's Club rankings.

In February 2013, Plaintiff was not allowed to move to a window cubicle, as requested. In April 2013, Plaintiff was asked to participate in weekly conference calls with Kyser.  In October 2013, Plaintiff's travel request to attend a Microsoft event was denied after Sloan presented it to management, because other members of the team would be attending and the travel budget was tight.

### III.    Discussion

After the parties had briefed Verizon's Motion for Summary Judgment, the Court issued an Order addressing issues surrounding Plaintiff's claim that he suffered a materially adverse action in retaliation for his protected activities.[26]  While Verizon had identified and analyzed twenty discrete adverse retaliatory actions, Plaintiff appeared to be limiting his claim to one of retaliatory hostile work environment, and at times conflated the two theories.  The Court addressed the standards for a retaliatory hostile work environment claim, and after reviewing the record, questioned whether Plaintiff had demonstrated a genuine issue of material fact that would entitle him to proceed to trial on that claim.  Since Verizon did not advance this argument in its motion, however, the Court provided Plaintiff notice and a reasonable time to respond why summary judgment should not be granted Verizon on the retaliatory hostile work environment claim, as permitted by Fed. R. Civ. P. 56(f)(2).  Plaintiff was also directed to clarify whether he was also asserting claims of retaliation based on discrete acts and if so, to identify those actions associated with the specific protected action that formed the basis of his claims.  Plaintiff responded that he asserts seven discrete claims of retaliation as well as a claim for retaliatory hostile work environment.[27]

Plaintiff alleges that he was the victim of retaliation, as that term is defined under Title VII and the ADA for his participation in the Melin investigation, as well as his own opposition to retaliation.  The Court notes that claims of retaliation under both Title VII and the ADA are analyzed using the same basic framework,[28] and the Court will refer to Title VII going forward.

---

[26]Doc. 51.

[27]Doc. 52.

[28]*Johnson v. Weld Cnty. Colo.*, 594 F.3d 1202, 1217 (10th Cir. 2010); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Title VII makes it unlawful to retaliate against an employee because the employee has opposed any practice made unlawful by Title VII, or because the employee has "participated . . . in an investigation, proceeding or hearing."[29]  In the absence of direct evidence of retaliation, the court assesses retaliation claims under the *McDonnell Douglas* burden-shifting framework.[30]  Under *McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[31]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nonretaliatory reason for its actions.[32]  If defendant articulates a legitimate nonretaliatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[33]  This framework requires Plaintiff to first establish a prima facie case of retaliation; if he does, the burden then shifts to Verizon to establish a legitimate, non-discriminatory reason for the alleged employment action; the burden then returns to Plaintiff to show Verizon's proffered reason is actually pretext for retaliation under either Title VII or the ADA.[34]

---

[29]42 U.S.C. § 2000e-3(a).

[30]411 U.S. 792, 802–04 (1973).  On June 24, 2013, the Supreme Court considered the causation standard that applies to Title VII retaliation claims, holding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m).  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  But this decision does not alter the continued application of *McDonnell Douglas* to Title VII retaliation claims at the summary judgment stage.  *See Jones v. Okla. City Pub. Schools*, 617 F.3d 1273, 1278–79 (10th Cir. 2010) (holding that *Nassar*'s predecessor *Gross* did not overrule application of the *McDonnell Douglas* burdenshifting framework to ADEA cases); *Moore-Stovall v. Shinseki*, 969 F. Supp. 2d 1309, 1321 n.15 (D. Kan. 2013) (explaining that *Nassar* does not alter the burdenshifting framework at the summary judgment stage of a retaliation claim, relying on *Jones*).

[31]*McDonnell Douglas*, 411 U.S. at 802.

[32]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[33]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[34]*Debord v. Mercy Health Syst. of Kan., Inc.*, 860 F. Supp. 2d 1263, 1271–72 (D. Kan. 2012).

### A.       Discrete Retaliatory Actions

### 1.       Prima Facie Case

The elements of a prima facie claim of retaliation under Title VII and the ADA are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[35]  All three elements are at issue in this case.

### a.       *Protected Activity*

Verizon does not contest that Plaintiff engaged in protected activity on three occasions: 1) on August 20, 2010, when he was interviewed in conjunction with the Melin investigation; 2) on September 20, 2010, when he submitted his own Internal Complaint; and 3) on October 24, 2011, when he filed an EEOC Charge.  Although it is undisputed that Plaintiff's only internal complaint of retaliation to Verizon's HR department was made in September 2010, he contends that beyond these particular instances, he continually engaged in protected activity by "complaining to his direct supervisors about his own claims of retaliation."  Plaintiff does not specifically identify each of his continuing complaints, but does cite to three emails: 1) the email to  Robles and Tyre dated November 16, 2011, in which he complains that he was being scrutinized and unfairly blamed for the conflict between himself and Austin Kyser; 2) the email to Robles and Tyre dated January 25, 2012, stating that his new role as a service engineer was a demotion and expressing concern that this was due to his "outstanding complaints"; and 3) the email to Sloan on October 5, 2012, expressing his belief that his removal as regional lead was a

---

[35]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

demotion and "a direct result of his outstanding complaints and indicates yet again, more retaliation against me."

Although "protected activity" can include voicing informal complaints to supervisors,[36] "to qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in [an unlawful] practice."[37]  "A vague reference to discrimination and harassment without any indication that this misconduct was motivated by age does not constitute protected activity and will not support a retaliation claim."[38]  The first two emails to Robles and Tyre do not refer to any action taken to protest or oppose statutorily prohibited discrimination.  "Although no magic words are required to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]."[39]  Plaintiff's references to "outstanding complaints" of harassment and unfair scrutinization and blame for conflict with a co-worker do not suggest that he was making complaint based on unlawful retaliation or discrimination.[40]  Without any such reference, these emails do not qualify as protected activity.  In the third email to Sloan, however, Plaintiff specifically complains that removal as regional lead was a demotion taken in retaliation for his outstanding complaints, and Sloan responded in a manner consistent with interpreting such as a complaint based on unlawful retaliation.  Accordingly, the Court finds

---

[36]*Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

[37]*Hinds*, 523 F.3d at 1203.

[38]*Id.* at n.13 (brackets and internal quotation marks omitted).

[39]*Id.*

[40]*See Brainard v. City of Topeka*, No. 12-4017-RDR, 2014 WL 588069, at *7 (D. Kan. Feb. 14, 2014) (holding general complaints to HR about job conditions and co-worker behavior did not specifically complain about age discrimination and thus did not qualify as protected activity).

that the October 5, 2012 email constitutes a fourth protected activity.

### b.    Materially Adverse Action

The "materially adverse" action element of a retaliation claim is more lenient than the "adverse employment action" element of Title VII claims.[41]  In the context of a retaliation claim, Title VII prohibits an employer from taking "materially adverse" action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity.[42]  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[43]  The court examines claims of adverse action through a "case-by-case approach, examining the unique factors relevant to the situation at hand."[44]  The materiality of a claimed adverse action is to be determined objectively; "petty slights, minor annoyances, and simple lack of good manners" will not deter "a reasonable worker from making or supporting a charge of discrimination."[45]  The Tenth Circuit has emphasized that deciding whether an employer's actions are "materially adverse" is a case-specific exercise that requires an objective inquiry that does not turn on a plaintiff's personal feelings.[46]  In making a decision, the court is obliged to consider the

---

[41]See Piercy v. Maketa, 480 F.3d 1192, 1203 n.12 (10th Cir. 2007) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)).

[42]Burlington, 548 U.S. at 63.

[43]Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1266 (10th Cir. 2009) (quoting Burlington, 548 U.S. at 67–68).

[44]McGowan v. City of Eufala, 472 F.3d 736, 742 (10th Cir. 2006).

[45]Id. (quoting Burlington, 548 U.S. at 68).

[46]Semsroth v. City of Wichita, 555 F.3d 1182, 1184–85 (10th Cir. 2009).

18

"'constellation of surrounding circumstances, expectations and relationships.'"[47]

### c.   Causal Connection

The Tenth Circuit has found a causal connection exists between the protected activity and the materially adverse action "where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive."[48]  Courts typically consider "protected conduct *closely followed by* adverse action" as sufficient evidence.[49]  However, when sufficient time has elapsed between the protected conduct and the adverse action, a court requires "additional evidence beyond temporal proximity to establish causation."[50]

When analyzing the additional evidence, the court can consider all the proffered evidence of retaliatory motive, which includes pretext evidence.[51]  "In order to make a prima facie case, one must only introduce evidence from which an inference can be drawn that an employer would not have taken the adverse action had the employee not filed prior discrimination charges."[52]  Ultimately, the burden of establishing a prima facie case is not onerous, but "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere

---

[47]*Barone v. United Airlines, Inc.*, 355 F. App'x 169, 183 (10th Cir. 2009) (quoting *Burlington*, 548 U.S. at 69 (internal quotation omitted)).

[48]*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[49]*Id.* (emphasis added).

[50]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *see e.g., Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding one and one-half months establishes causation while three months is too long and does not).

[51]*Xia v. Salazar*, 503 F. App'x 577, 580 (10th Cir. 2012) (citing *Anderson*, 181 F.3d at 1179).

[52]*Tex. Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)

19

speculation, conjecture, or surmise."[53]  Finally, the Supreme Court has recently clarified that a

Title VII plaintiff asserting a claim of retaliation must show that his protected activity was the

but-for cause of the alleged adverse employment action, and not merely a motivating factor.[54]

### 2.     Pretext

"If the [employee] succeeds in proving the prima facie case, the burden shifts to the

[employer] to articulate some legitimate, nondiscriminatory reason for the employee's

rejection."[55]  The employee must then show that the employer's proffered reasons are merely

pretextual, or a cover for a true retaliatory intent.  The plaintiff must demonstrate that the

proffered reason was "so incoherent, weak, inconsistent, or contradictory that a rational

factfinder would conclude the reason [is] unworthy of belief."[56]  Thus, the court is not required

---

[53]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (affirming grant of summary judgment to employer because "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings.").

[54]*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  The parties do not dispute that the "but-for" causation standard also applies to claims brought under the ADA.  The Court agrees.  The ADA uses similar "because" language, and the Tenth Circuit has consistently applied the Title VII framework to ADA retaliation claims.  *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164,  1171 (10th Cir. 2006); 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter. . . .").  Although the Tenth Circuit has not had the opportunity to apply the but-for causation standard to ADA retaliation claims, lower courts have reasoned that because ADA retaliation claims are analyzed under the same framework as Title VII retaliation claims, the *Nassar* but-for standard applies outside the context of Title VII.  *See Purcell v. Am.. Legion*, —F. Supp. 2d—, 2014 WL 4244328, at *5 (E.D. Wash. Aug. 26, 2014); *Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.*, No. 12-cv-00817-RLY-DML, 2014 WL 3942362, at *1 (S.D. Ind. Aug. 12, 2014); *Hutchins v. DirecTV Customer Serv., Inc.*, No. 11-CV-422-REB, 2014 WL 3572045, at *12 (D. Idaho July 21, 2014); *Carvajal v. Pride Indus., Inc.*, No. 10cv2319-GPC, 2014 WL 1921732, at *6 (S.D. Cal. May 14, 2014) (collecting cases); *Goodwin v. Wellstar Health Sys., Inc.*, No. 12-cv-3752-WSD, 2014 WL 1275593, at *4 n.8 (N.D. Ga. Mar. 27, 2014) (applying "but-for" causation standard to ADA claim because it includes "because" language similar to Title VII); *Brooks v. Capistrano Unified Sch. Dist.*, No. 12-01934-JLS, 2014 WL 794581, at *6 (C.D. Cal. Feb. 20, 2014) (applying "but-for" causation standard to ADA claim because ADA claims are subject to the same framework of analysis as that of Title VII claims).  *Cf. Melin v. Verizon Bus., Inc.*, No. 12-cv-2426-EFM,  2014 WL 978813, at *12 (D. Kan. Mar. 1, 2014) (holding that since plaintiff could not establish causation in ADA claim under the more minimal standard, it stood to reason he could not maintain causation under the heightened standard in *Nassar*).

[55]*McDonnell Douglas*, 411 U.S. at 802.

[56]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008) (quotation omitted).

to judge if a decision was "wise, fair or correct, but whether [the employer] honestly believed the reasons [it gave for its conduct] and acted in good faith on those beliefs."[57]  The plaintiff must establish more than that the "employer got it wrong."[58]  "[The employee] must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden [retaliatory] agenda."[59]

### 3.    Application

With these standards in mind, the Court discusses in turn Plaintiff's seven alleged discrete retaliatory actions.[60]

### a.    Austin Kyser and Reassignment of Kansas City Accounts

Plaintiff contends that starting in 2011, he was harassed by Kyser, who lodged unwarranted complaints about Plaintiff, demeaned him in front of co-workers and management, and complained that Plaintiff moved his desk closer to Melin.  Plaintiff characterizes Kyser's behavior as "relenting [sic] and abusive." Although his allegations are less than clear, it appears Plaintiff is claiming that Kyser engaged in retaliatory harassment, and that Robles responded to Plaintiff's complaints about Kyser by stripping him from supporting any new opportunities that

---

[57]*Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

[58]*Id.*

[59]*Id.*

[60]The Court notes that Plaintiff's EEOC Charge was filed in October 2011, leaving the Court to question whether it lacks jurisdiction over the alleged discrete claims of retaliation that occurred after the Charge was filed, specifically, Plaintiff's removal from the Walmart account and as regional lead, and the filing of the ethics complaint, all of which occurred in 2012.  *See Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (holding each discrete incident of discriminatory or retaliatory action constitutes its own unlawful employment practice that must be individually administratively exhausted).  No copy of the Charge is provided in the record, however, nor does Verizon raise the issue.

arose in Kansas City, and assigning those accounts to Rick Schuchmann.  In other words, Plaintiff contends that the reassignment of his Kansas City accounts to Rick Schuchmann in August 2011 was made by Robles and Trippel in retaliation for the conflict between Plaintiff and Kyser, which was also retaliatory in nature.

The Court disagrees that Plaintiff's claim that he was the victim of harassment by Kyser is sufficient to support a retaliation claim.  For an employer to be liable for coworker hostility or retaliatory harassment, 1) supervisory or management personnel must either orchestrate the harassment, or know about it and acquiesce in the harassment in such a manner as to "condone and encourage" the coworker's conduct, and 2) the conduct must be "sufficiently severe."[61]  The record does not support a finding that Kyser's conduct is actionable adverse conduct.  Despite making sweeping allegations of Kyser's continuing barrage of complaints and harassing action against him, the only concrete example offered by Plaintiff is that Kyser stated on a conference call in front of others that he would never work with Nordike again.  While there is no dispute that Nordike and Kyser had a contentious working relationship, a hostile work environment is not created by "the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing."[62]  Plaintiff characterizes Kyser as being known as a "difficult employee," and Plaintiff's proffered examples of Kyser's comments are not enough to show that his workplace was permeated with abuse.  Further, even if sufficiently hostile, Plaintiff fails to impute that liability to Verizon.  Here, the evidence shows that after Nordike complained,

---

[61]*Juarez v. Utah*, 263 F. App'x 726, 737 (10th Cir. 2008) (citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998)).

[62]*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Verizon management attempted to resolve the conflict between Kyser and Plaintiff, to get them to "play nice," and that Trippel believed that Nordike was the problem.  And while Roble's reaction by laughing in response to Kyser's statement that he would never work with Plaintiff again, while rude or inappropriate, does not rise to the level of sanctioning or acquiescing in the purported harassment.  Moreover, there is no evidence that Kyser knew of Plaintiff's participation in the Melin complaint or EEOC Charge, or that his alleged harassment was in response to Plaintiff's protected activity.

The Court agrees with Plaintiff that reassignment or removal from accounts is a material adverse action for purposes of his retaliation claim.  But even if Kyser's harassment of Plaintiff was sufficiently severe, Plaintiff's showing of causation is problematic.  First, as previously discussed, Plaintiff's email complaint in November 2011, about his conflict with Kyser does not qualify as protected activity, and in any event, occurred after the accounts were reassigned.  While it is clear that Plaintiff and Kyser did not get along, Plaintiff's claim for retaliation must ultimately relate back to his alleged protected action.  Reassignment of the Kansas City accounts occurred nearly a year after Plaintiff made his Internal Complaint about Kubicki.  Plaintiff therefore does not have the retaliatory inference afforded by temporal proximity to the respective protected activity.

Moreover, Plaintiff has not demonstrated that Verizon would not have these accounts but for his protected conduct.  The record shows that Plaintiff was very busy, and that certain projects that involved less complex VOIP issues were assigned to Schuchmann, leaving Plaintiff to focus on more complex VOIP projects.  Thus, Verizon is entitled to summary judgment on this claim because Plaintiff has failed to establish a prima facie case of retaliation.

Even if the court were to conclude that Plaintiff had established a prima facie case, however, he has further failed to prove that Verizon's proffered legitimate reasons were are pretextual.  Plaintiff questions reassignment of certain the Kansas City accounts to a generalist SE as "weak and questionable at best."  Plaintiff's claim that the decision to remove him from certain accounts was made by the manager who considered Plaintiff to be the issue in the conflict with Kyser.  That manager was Shaun Trippel, however, who was never Plaintiff's manager and never had authority to assign accounts to or from Plaintiff.   There is no evidence that Robles thought Plaintiff was the issue in the conflict with Kyser.  Plaintiff also argues that he never complained about his workload and that he found out about the reassignment of accounts through an email with Schuchmann.  Robles testified, however, that the reassignment was intended to alleviate some of Plaintiff's heavy workload, after several conversations with Plaintiff about the issue proved unsuccessful.  And, Plaintiff's allegations that no changes were made to Kyser's workload are unavailing, as Kyser was a global solutions consultant for Verizon, not an SE, with entirely different job duties than Plaintiff.   Plaintiff has failed to provide evidence that proves or even suggests that Verizon did not "honestly believe" its reasons for reassigning the Kansas City projects.  The Court is not to decide whether Verizon's decisions are the best decisions or the most fair.  Rather, the Court's role is only to ensure that decisions are not made for improper reasons.  The Court concludes that, even viewing the facts in a light most favorable to Plaintiff, no reasonable jury could conclude that the "but for" reason the Kansas City accounts were reassigned was because of retaliation for his protected activities. Summary judgment is granted to Verizon on this claim.

**b.**     **Removal from Walmart Account**

Plaintiff contends that in March 2012, he was removed from many larger accounts, including the Walmart account, in retaliation for filing his EEOC complaint in October 2011.  It is undisputed that in 2012, Verizon realigned its geographic regions, and that this realignment was a corporate restructuring that affected multiple employees.  The record further shows that as a result of the realignment, Plaintiff was removed from the Walmart account, and any other account in the Southern Region that he previously supported.  Although Plaintiff concedes that the corporate restructuring itself was not an act of retaliation, he argues nonetheless that his removal from the Walmart account is a materially adverse act that constitutes retaliation.

The Court agrees that generally, an employee's removal from a large account such as this can be considered a materially adverse action for purposes of a retaliation claim.  As the Supreme Court emphasized, however, context and "the constellation of surrounding circumstances, expectations, and relationships" is key to making the determination of whether an action is materially adverse.[63]  In this case, the action was the corporate restructuring—realignment of the regions and removal from the Walmart and other accounts is the byproduct of that action, that affected Verizon employees nationwide.  Accordingly, the Court is hard pressed to conclude that a "reasonable employee in [Plantiff's] shoes would have found the defendant's conduct sufficiently adverse that he well might have been dissuaded by such conduct from making or supporting a charge of discrimination."[64]

Assuming removal from the Walmart account is a materially adverse action, Plaintiff has failed to make a prima facie case of causation.  Because removal from the Walmart account

---

[63]*Burlington*, 548 U.S. at 69.

[64]*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007).

occurred approximately five months after the filing of his EEOC complaint in October 2011, a causal connection must be inferred from the circumstantial evidence.  And because removal from the Walmart account was the result of the corporate restructuring and realignment, Plaintiff cannot show that removal from the account was "but for" his protected activity.

Even if the Court were to conclude that Plaintiff had established a prima facie case, however, he has further failed to prove that Verizon's proffered legitimate reasons are pretextual. Plaintiff argues evidence of pretext is demonstrated by the fact that another SE who was not located in the Southern Region was assigned to the Walmart account, and that Plaintiff was not reassigned to Walmart after it became a "vertical account."  The record shows, however, that while the other SE who continued to support the Walmart account lived in Missouri, he worked in Bentonville, Arkansas, which was part of the Southern Region after the realignment.  And with respect to Verizon's decision not to reassign Plaintiff to the account after the complained of act, the Court is not to decide whether Verizon's decisions are the best decisions or the most fair. Thus, Plaintiff has not presented evidence that would lead a reasonable jury to conclude Verizon's proffered reasons were "unworthy of belief," and summary judgment is granted on this claim.

### c.      Removal from Regional Lead Position

Plaintiff contends that his removal from the Regional Lead position in October 2012 was done in retaliation after he "complained."  Plaintiff argues that this action constitutes a demotion and affects his future promotional activities.  Verizon counters that the regional lead position is not a formal position, but merely a designation of someone who can submit designs to higher level engineers for their approval.  The Court will assume for purposes of this motion that

removal was a materially adverse action.  Plaintiffs fails, however, to make a prima facie showing of causation.  Removal as regional lead occurred almost one year after Plaintiff filed his EEOC Charge; the emails Plaintiff sent complaining about general issues do not constitute protected action, as discussed above, and the email to Sloan alleging retaliation was made after his removal.  Moreover, Plaintiff cannot show that his removal as regional lead was but-for his EEOC Charge; the record shows that he was one of twenty-four SEs nationwide who were removed from like positions because their field submissions required remediation.

Likewise, Plaintiff's attempt to show that Verizon's explanation for his removal is pretext because it did not place him back into a regional lead position once a designated lead in his area resigned is unsuccessful.  Verizon proffers that the reduction was done in an attempt to alleviate the burden on the Tier II engineers due to the incomplete and inaccurate submissions from the regional leads.  Because Verizon was reducing its regional lead positions to a limited number of employees, it explains that an employee who made occasional errors, such as Plaintiff, would be removed over an employee who made no errors.  Plaintiff has not pointed to any evidence in the record that other engineers were allowed to maintain a regional lead designation despite making occasional errors, nor can he show that Verizon did not honestly believe its reason for its decision at the time it was made.  Plaintiff's argument that it is inconsistent to state that he was still competent and skilled at his primary job function of providing VOIP expertise despite his removal is unavailing.  Summary judgment is granted to Verizon on this claim.

### d.     Branded as Inappropriate for Management

Plaintiff broadly alleges that his complaints and retaliatory behavior he has been

27

subjected to have "branded him inappropriate for management."  In support of his argument,

Plaintiff cites testimony of Brenda Tyre that he was not a candidate for management in 2012:

> Q: What does emerging talent mean?
> A: That means that he has—he's a very strong engineer, and he's got, you know, strong skill set.  If he, you know, continues to perform and—you know, he could—he could be emerging talent.  He could be future—you know, a future performer.  I mean, it's emerging talent.  He's doing a good job in marketing, say, smart guy.
> Q: Would that be an indication that he would potentially be slotted for management at some time later?
> A: I didn't say that.  I didn't say that.
> Q: No, I'm asking you that question.
> A: In the—in the HR definition of emerging talent, yes, that is correct.
> Q: Now, you said you didn't say that.  Do you have some concern that Mr. Nordike should not be slotted for management?
> A: I didn't—I did not say that.
> Q: So—and I understand you—well, what I'm trying to understand is what you meant by I didn't say that.  Is there any reason that you know of from your management over in 2011 that he would not be appropriate for management?
> A: Yes. And—
> Q: What would that —
> A: Well, as evidenced by—one of the qualifications for a leader or a manager is to be able to get along well with others, work well with others and manage conflict, you know, communicate effectively.  And so I believe Alan is a very solid engineer, but because there were communication issues, I would say that in 2012 I wouldn't think that he would be a management—a management candidate.  Now, understand, you can—you can rank somebody in the talent system as emerging talent.  That doesn't mean the very next year they're—they're going to get promoted.
> Q: Okay.
> A: You think that they have the to qualify—you know.
> Q: The communications issues that you're speaking of according to the Verizon business practices that are used fair practices, you said something about—you made some mention of fair business practices or something like that.
> A: I—
> Q: Okay.  Anyway, in regards to the communications issues, are

> you speaking of the issues that were brought to your attention
> by—involving Mr. Trippel and Mr. Kaiser [sic]?
> A: Yes.[65]

As Verizon points out, however, the cited deposition testimony states only that in 2012, Tyre did not think Plaintiff would have been appropriate for a management position.  There is nothing in the record to indicate that he has been denied a management position since then or that he is prevented from obtaining a managerial position in the future.[66]  Accordingly, the Court is hard pressed to agree that the so-called "branding" constitutes a materially adverse action.  Moreover, the cited testimony states that Tyre's opinion was based on Plaintiff's conflict with Kyser, not any protected activity.  She goes on to testify:

> Q: Is there any reason that you would believe that Mr. Nordike's
> concerns and complaints about—that had been brought to the
> attention of human resources and ultimately have required us to
> meet here today, that that would imply that he would not be
> appropriate for management?
> A: I did not say that.
> Q: No, I know you didn't say that.  I'm asking you the question.
> Would it be your opinion that being involved in an HR concern
> that ultimately resulted in the situation that we're here now where
> we're taking your deposition and we've go other issues going on
> with depositions and that—and people calling you for interviews,
> would that be a reason that Mr. Nordike would not be a good
> candidate for management?
> A: No.  I mean, it's his performance and this going on is—has no
> impact.  That's not a factor.[67]

Summary judgment is granted Verizon on this claim.

---

[65]Doc. 47, Ex. 3 at 81:21-25–83:1-22.

[66]In its Memorandum in Support of Motion for Summary Judgment (Doc. 38), Verizon specifically addressed the issue of whether failure to promote Plaintiff to the position that went to Robles in January 2011 constituted a materially adverse action and whether its reason for doing so was pretextual.  Plaintiff does not list failure to promote in 2011 as a discrete action in his supplemental brief.

[67]*Id.* p. 83:23-25–84:1-15.

e.      **Ethics Complaint**

Plaintiff asserts that "shortly after" he filed his Charge with the EEOC, he was charged with an ethics violation.  The complaint was made in February 2012 by Mark Red, a contracts manager in Verizon's legal department, who was working on a contract for a customer and noticed that the contact for the customer was also named Nordike.  It is undisputed that Plaintiff did not provide any information about his relationship to the customer's employee and that he did not report the potential conflict of interest, as required by Verizon's Code of Conduct.  Red, who was not Plaintiff's manager, followed Verizon's policies when he became aware of a possible conflict of interest, and after the investigation, Plaintiff was given a written warning for failing to disclose the possible conflict of interest.  The Court agrees with Plaintiff that disciplinary or other investigations can constitute materially adverse actions that would support a retaliation claim.

Once again, however, Plaintiff falls short on proving a prima facie case of causation.  First, there is no temporal proximity, as the ethics complaint was filed four months after Plaintiff's EEOC Charge, and the written warning was filed sometime thereafter at the conclusion of the investigation.  Nor is there any evidence in the record to show that Red had knowledge of Plaintiff's protected activity, and Plaintiff has no knowledge of any communication between Red and Robles or Kubicki regarding the ethics complaint.  Moreover, there is no evidence that Plaintiff received the written warning because of his protected activity, as there is no evidence that Sloan issued the warning for any reason other than the ethics investigator's recommendation that he do so.

Plaintiff argues that Verizon's proffered reason for the ethics complaint is pretextual, as

Red advised Nordike that the transaction could proceed.  But Red filed the ethics report for failure to disclose a family relationship as required by the Verizon Code of Conduct, and an investigation ensued.  The fact that the transaction was allowed to proceed does not mean that Plaintiff did not violate the Code of Conduct, Plaintiff's subjective belief notwithstanding. Summary judgment is granted to Verizon on this claim.

### f.      Ongoing Hostility from Managers

Plaintiff alleges "ongoing hostility" as a form of discrete retaliation.  The Court agrees with Verizon that this is a retaliatory hostile work environment claim, and will address it as such, below.

### g.      Failure to Pay Commissions

Although Plaintiff contends that he was not paid commissions on accounts he supported, he concedes that the commission payments were merely delayed.  Plaintiff argues that this delay, coupled with his having to "jump through numerous hoops" to get the answers he was seeking, constitutes a materially adverse action.  The Court disagrees.  It is undisputed that in 2013, Plaintiff made an inquiry about the calculation of his commissions for 2012, and was ultimately compensated on August 30, 2013, along with other SEs.  It is further undisputed that the additional commissions paid to Plaintiff and other SEs in 2013 had no impact on President's Club rankings.  Accordingly, the Court finds this conduct does not qualify as a materially adverse action that supports a retaliation claim.[68]  Summary judgment is granted on this claim.

### B.      Retaliatory Hostile Work Environment

---

[68]*See Melin v. Verizon Bus., Inc.*, No. 12-cv-2426-EFM, 2014 WL 978813, at *9 (D. Kan. Mar. 12, 2014) (rejecting plaintiff's claim that delayed commission compensation and/or accounting errors constitute materially adverse actions in retaliation for ADA complaint).

In addition to the discrete retaliatory actions discussed above, Plaintiff complains that he was the target of ongoing and continuing retaliatory actions by his managers, which created a retaliatory hostile work environment.  As discussed above, for purposes of a retaliation claim, an action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[69]  Since this standard was articulated by the Supreme Court in *Burlington Northern & Santa Fe Railway v. White*, however, the question was raised whether plaintiffs attempting to show a retaliatory hostile work environment could survive summary judgment by meeting this broadened standard instead of the traditional standard used to evaluate hostile work environment claims.[70]  After *Burlington*, the Tenth Circuit has stated that a plaintiff must satisfy the same standard used to evaluate conventional hostile work environment claims; that is, the incidents of harassment following a complaint must "render the workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."[71]  Accordingly, the Court will first apply the traditional hostile work environment

---

[69]*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006).

[70]*Jones v. Wichita St. Univ.*, 528 F. Supp.2d 1182, 1194, n.9 (D. Kan. 2007) (citing *Khan v. HIP Centralized Lab. Servs., Inc.*, No. CV-03-2144, 2007 WL 1011325, at *10 (E.D.N.Y. Mar. 30, 2007) (stating that lower standard for retaliatory hostile work environment claims may be appropriate)).

[71]*Samoza v. Univ. of Denver*, 513 F.3d 1206, 1217–18 (10th Cir. 2008) (applying "severe and pervasive" standard to claim of retaliatory harassment); *McGowan v. City of Eufala*, 472 F.3d 736, 743 (10th Cir. 2006) (same)*; Lounds v. Lincare, Inc.*, No. 13-1091-RDR, 2014 WL 3361751, at *15 (D. Kan. July 9, 2014); *Melin v. Verizon Bus., Inc.*, No. 12-CV-2426-EFM, 2014 WL 978813, at *8 (D. Kan. Mar. 12, 2014); *Jones v. Wichita St. Univ.*, 528 F. Supp. 2d 1182, 1193-94 (D. Kan. 2007); *Brenna v. Salazar*, No 08-01696-LTB-CBS, 2010 WL 582357, at *15 (D. Colo. Feb. 17, 2010) (citing *McGowan*, 472 F.3d at 743);  *Cajamarca v. Regal Entm't Grp.*, 863 F. Supp. 2d 237, 253-55 (E.D.N.Y. 2012) (collecting cases); *cf. Alvarado v. Donahoe*, 687 F.3d 453, 461 (1st Cir. 2012) (applying *Burlington* standard); *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007) (same); *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (same); *Turrentine v. United Parcel Serv.*, 645 F. Supp. 2d 976, 986 (D. Kan. 2009) (applying *Burlington* standard in discussion of whether plaintiff had preserved claim of retaliatory harassment in pretrial order).

standard to Plaintiff's claim.[72]

"[There] is not, and by its nature cannot be, a mathematically precise test" for a hostile

work environment claim.[73]  Factors relevant to determining whether a reasonable jury could find

a plaintiff's work environment to have been hostile include "the frequency of the conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."[74]  "Simple teasing . .

. offhand comments, isolated incidents (unless extremely serious)" do not alone give rise to a

hostile work environment, as they do not change the "terms and conditions of employment."[75]

Plaintiff's retaliatory hostile work environment claim is premised on what he claims is

the aggregate effect of Verizon's actions, including the conduct he also claims as discrete

adverse employment actions.  Plaintiff alleges that in 2010, Kubick was "very hostile" to him,

and that she held weekly one-on-one meetings with Plaintiff and questioned him about why he

was working on accounts that are tied to Melin; scheduled meetings with sales engineers that did

not include Plaintiff; increased Plaintiff's workload at a disproportionate amount than the

workload for other sales engineers under her supervision because of work on the Walmart

opportunity; questioned Plaintiff's expense accounts; denied him approval to travel to support

the Walmart and HBC accounts; spoke negatively about Plaintiff to other Verizon employees;

---

[72]Plaintiff urges the Court to follow the lower standard discussed in *Turrentine*, 645 F. Supp. 2d at 986, which he mistakenly cites as controlling Tenth Circuit precedent.

[73]*Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957–58 (10th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)).

[74]*Id.* (citing *Harris*, 510 U.S. at 23).

[75]*Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

would have other engineers redo his quotes on business proposals, which prevented him from receiving a commission on those accounts; and threatened Plaintiff's job by asking if he liked his paycheck and would like the pay of a technician.

Plaintiff contends this retaliatory hostile work environment continued in 2011, starting in January when he was not offered the promotion that went to Robles. Plaintiff alleges that Kubicki excluded him from sales meetings; that he was pulled of the Kansas City accounts he had previously supported and "magically" put back on those accounts; that Robles harassed him by having one-on-one meetings with Plaintiff; that Shaun Trippel excluded him from a conference call related to the Walmart account; and that he was not paid on a quote he prepared for NBH.

Plaintiff contends that in 2012, he was pulled off the sales team as a sales engineer and given the job of service engineer and was instructed to bill his time to customers; that in February 2012, Trippel attributed to Plaintiff a personality conflict between Plaintiff and a global solutions consultant; as a result of the March 2012 reorganization, Plaintiff was taken off the WalMart account; he was not paid on quotes he prepared for Walmart; an ethics complaint was filed against him for his work on the BNIM account; and he was removed as a regional lead; he was required to meet weekly with Sloan. Plaintiff also alleges that he received poor performance reviews.

And, continuing into 2013, Plaintiff contends that he was not paid commissions on 2012 accounts, which cost him admission to the President's Club; he was not allowed to move to a window cubicle; he was asked to participate in weekly conference calls with Kyser, and his travel request to attend a Microsoft event was denied.

Some of the actions identified by Plaintiff have already been addressed as discrete employment actions. While the Court questions whether discrete actions that independently support a retaliation claim can also support a retaliatory hostile work environment claim, determination of this issue is not necessary to resolution of the motion for summary judgment.[76] Even if these events are considered in the context of Plaintiff's claim for retaliatory hostile work environment, the Court concludes that there is insufficient evidence to establish that Plaintiff was subjected to an objectively abusive working environment. In so ruling, the Court relies in part on the weaknesses of many of Plaintiff's claims that have been discussed throughout this Order. Significantly, many of the actions Plaintiff complains of affected multiple SEs and Verizon employees nationwide. Likewise, none of the actions complained of were physically threatening, abusive or humiliating. Instead, the conduct described by Plaintiff is the type of "ordinary tribulations of the workplace" not actionable as a retaliatory hostile work environment claim.[77] For example, non-selection for a desirable position, assignment to undesirable duties, and being criticized by supervisors do not establish a hostile work environment.[78] While the Court does not wish to trivialize the difficulty that Plaintiff may have subjectively felt in dealing

---

[76]*See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 84–85 (D.D.C. 2013) (discussing the difference between tangible employment actions and hostile work environment claims, the essence of the latter being a series of acts that collectively alters the terms of employment due to severe or pervasive nature of the conduct) (citing *Burlington*, 524 U.S. at 753–54).

[77]*Faragher*, 524 U.S. at 788.

[78]*Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6 (D.D.C. 2012) (holding that no reasonable jury could find a hostile work environment where supervisor gave plaintiff negative performance appraisals, criticized her, increased scrutiny of her work, raised his voice during meetings, slammed his hand on the table, angrily threw a notebook in her direction, and placed her in a "Team of One," which isolated her from coworkers).

with supervisors and colleagues that do not like him or are rude or disrespectful, the conduct described is not indicative of the pervasively hostile work environment necessary to survive the objective test of the second prong of the prima facie case standard.

Plaintiff relies heavily on *Turrentine v. United Parcel Service, Inc.*[79] to support his argument.  In that case, the defendant's motion for summary judgment only addressed the alleged retaliatory acts individually as discrete acts of retaliation.[80]  The court held that the facts described by plaintiff were sufficient to preserve a claim of retaliatory harassment, but that its ability to analyze the merits of plaintiff's claim was limited because defendant had not addressed the claim, but viewing the evidence in the light most favorable to plaintiff, concluded that her "laundry list" of allegedly retaliatory acts, considered in the aggregate, was enough to rise to the level of a materially adverse action.[81]  Specifically, plaintiff alleged that her supervisor was instructed by defendant to write up plaintiff "for every little thing and give her warning letters when it wasn't the proper step in progressive discipline," "to hold plaintiff accountable for every little number mistake or dispatch mistake," and to "'change dispatch' in a manner that made it impossible for plaintiff to make her deliveries in a timely fashion."[82]  Thus, *Turrentine* can be distinguished from this case both procedurally and factually, as there is no evidence that Plaintiff's supervisors colluded in such a retaliatory manner.

---

[79] 645 F. Supp. 2d 976 (D. Kan. 2009).

[80] *Id.* at 985.

[81] *Id.* at 986–87.

[82] *Id.* at 987–88.

Nor do Plaintiff's allegations collectively rise to the level of a material adverse action under the *Burlington* retaliation standard.  The incidents that Plaintiff identifies fall squarely within the categories of "trivial harms," or "petty slights or minor annoyances that often take place at work and that all employees experience," which would not dissuade a reasonable employee from making a complaint of retaliation.[83]  Indeed, the Court notes that Plaintiff was not dissuaded from making additional complaints to his supervisors after suffering alleged harassment, albeit complaints that did not qualify as protected action, and maintains that he continues to complain about his unfair treatment to this day.  While not dispositive, this suggests that the conduct of which Plaintiff complains did not rise to the level of material adverse action.[84]

Moreover, the record suggests a lack of causal connection between the alleged harassment and Plaintiff's protected activity.  Several of the acts Plaintiff complains of with respect to Kubicki occurred before August 2010—his doubled workload and denial of travel to support the NBH account—and others, such as excluding him from meetings and questioning his work and expenses, have no specific dates or time frames.  Likewise, much of the conduct he complains of occurred over three months after his Internal Complaint in September 2010 and his EEOC Charge in October 2011.  Further, Plaintiff has not established but-for causation of retaliation—there is evidence of a personality conflict between Kubicki and Plaintiff even prior

---

[83]*Burlington*, 548 U.S. at 68 ("[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable.").

[84]*See Levitant v. City of New York Human Res. Admin.*, 558 F. App'x 26, 29 n.2 (2d Cir. 2014) (noting that employee was not deterred from making complaints); *Hahn v. Bank of Am.*, No. 12 Civ. 4151(DF), 2014 WL 1285421, at *24 (S.D.N.Y. Mar. 31, 2014) (same).

to his protected activity, and Kyser had a reputation as a difficult employee; several acts were global changes that affected employees across the company; and reassignment of some of the Kansas City accounts was done to allow Plaintiff to alleviate his workload and focus on more complex projects.

Accordingly, the Court concludes that Plaintiff cannot show that the alleged harassment was a materially adverse action under either standard articulated above, so as to rise to the level of a retaliatory hostile work environment.  Summary judgment is also granted on this claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Verizon's Motion for Summary Judgment (Doc. 37) is GRANTED; summary judgment is also GRANTED on Plaintiff's retaliatory hostile work environment claim, per the Court's Order issued pursuant to Fed. R. Civ. P. 56(f)(2).

**IT IS SO ORDERED.**

**Dated:** **September 24, 2014**

 **S/ Julie A. Robinson**

**JULIE A. ROBINSON**

**UNITED STATES DISTRICT JUDGE**